## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

       Plaintiff,

    vs.                                 No. **CR 02-1595 MCA**

**JOEL MARQUEZ**,
**JOEL LUJAN**,
**SAUL SOTO**, and
**HECTOR TORRES**,

       Defendants,

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant Hector Torres' *Motion to Suppress Evidence and Statements* [Doc. No. 34] filed on October 17, 2002, Defendant Saul Soto's *Motion to Suppress Evidence and Statements* [Doc. No. 41] filed on October 18, 2002, and Defendant Joel Marquez's *Motion to Suppress Statements* [Doc. No. 42] filed on October 18, 2002.  On December 6, 2002, the Court held an evidentiary hearing on these three motions in Albuquerque, New Mexico.  Having fully considered the pleadings of record, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court **GRANTS IN PART** and **DENIES IN PART** the motions of Defendants' Marquez and Torres, and **DENIES** the motion of Defendant Soto, based upon the following findings of fact and conclusions of law.

## I.   __FINDINGS OF FACT__

1.      There are four defendants in this case:  Joel Marquez, Joel Lujan, Hector Torres, and Saul Soto.  The charges against each defendant arise from the same series of events that occurred on or about August 16, 2002, in Albuquerque, New Mexico.

2.      Albuquerque Police Department (APD) Task Force Officer Arthur Lucero and Drug Enforcement Agency (DEA) Special Agent Mickey Teague were on duty in Albuquerque, New Mexico, during the daytime hours on or about August 16, 2002, when the events described below occurred.

3.      Officer Lucero received a call from a DEA agent in Las Cruces who indicated that he was looking for an officer who spoke Spanish to participate in a possible undercover operation involving the purchase of two kilograms of cocaine.  Officer Lucero told the DEA agent that he understood Spanish and that the person seeking to sell the two kilograms of cocaine could call him on his mobile phone.

4.      Officer Lucero testified that he grew up in the Albuquerque, New Mexico area speaking both English and Spanish, that he is "almost pretty much" bilingual, and that he has served as an interpreter in a prior state court proceeding.

5.      All of Officer Lucero's conversations with the suspects involved in the proposed sale of two kilograms of cocaine on or about August 16, 2002, were conducted primarily if not exclusively in the Spanish language.

6.      Officer Lucero and the suspects were able to communicate with one another in a manner that was sufficient to negotiate and arrange for the sale of the two kilograms of

cocaine, and Officer Lucero was able to accurately translate the substance of the suspects' communications to the other officers involved in the undercover operation.

7.     Approximately twenty to thirty minutes after speaking to the DEA agent, Officer Lucero received the first call from the person seeking to arrange for the sale of the two kilograms of cocaine.  Based on events described below, Officer Lucero subsequently was able to credibly identify the caller as Defendant Joel Marquez.

8.     During the first call, Defendant Marquez quoted a price of $16,000 per kilogram for the cocaine, and Officer Lucero told Defendant Marquez to call back in one and one-half hours to make further arrangements for the sale of the cocaine.

9.     At approximately 1:45 p.m., Officer Lucero received a second telephone call from Defendant Marquez seeking to arrange for the sale of two kilograms of cocaine.

10.     During the second call, Officer Lucero made arrangements to meet Defendant Marquez at a gas station at the corner of Gibson and University in Albuquerque, New Mexico, for the purpose of purchasing two kilograms of cocaine.  Defendant Marquez told Officer Lucero that he would be driving a white Ford pickup truck.

11.     After making these arrangements, Officer Lucero immediately contacted other law enforcement officers, who set up surveillance around the gas station where Officer Lucero had arranged to meet Defendant Marquez.  Officer Lucero told the other undercover officers to be on the lookout for a white Ford pickup truck at that location.

12.     Officer Lucero testified that, based on his training and experience in undercover operations involving drug traffickers, it is a common practice in relatively large

transactions (such as those involving two kilograms of cocaine) for the traffickers to set up counter-surveillance around the site of the proposed transaction to make sure they are not being watched by law enforcement officers.

13.     Agent Teague also testified that, based on his training and experience in undercover operations involving drug traffickers, traffickers who negotiate a relatively large drug transaction (such as that involving two kilograms of cocaine) often travel in a vehicle that is separate from the vehicle in which the drugs are actually transported, so as to facilitate their counter-surveillance and the avoidance of responsibility for the drugs in the event of a search or seizure.

14.     Agent Teague was among the other law enforcement officers who set up and participated in the surveillance at the gas station regarding the proposed sale of the two kilograms of cocaine.

15.     Agent Teague testified, without objection, that shortly before 3:00 p.m., and prior to his arrival at the gas station, he received a radio call from another officer involved in the undercover operation at that location who reported the following information:  (a) a blue pickup truck had entered the gas station parking lot, circled the area a couple of times, and parked in a parking area within the gas station property but away from the gas pumps; (b) after the blue pickup truck had parked on the gas station property, a white Ford pickup truck had entered the gas station parking lot, circled the area a couple of times, and parked in a hotel parking lot immediately adjacent to the gas station property; and (c) the other officers did not observe anyone exit from the blue pickup truck or the white Ford pickup

truck to engage in any normal business such as pumping gas, using a pay phone, or entering the store area of the gas station.

16.     At approximately 3:00 p.m., Officer Lucero testified that he received a third telephone call from Defendant Marquez seeking to arrange the sale of the two kilograms of cocaine.  During that call, Officer Lucero was positioned at Broadway and Gibson in Albuquerque, New Mexico, and he informed Defendant Marquez that he would arrive at the gas station at Gibson and University in approximately five minutes.

17.     Officer Lucero testified that by using the "Caller I.D." feature on his mobile telephone, he was able to identify the following number as the source of all three calls that he received from Defendant Marquez seeking to arrange the sale of the two kilograms of cocaine:  505-649-3465.

18.     Agent Teague testified, without objection, that during the time that Officer Lucero was receiving the third call from Defendant Marquez seeking to arrange the sale of the two kilograms of cocaine, other undercover officers reported observing one of the occupants of the white Ford pickup truck speaking on a mobile phone while that truck was parked next to the gas station at Gibson and University.

19.     After completing his third call with Defendant Marquez, Officer Lucero traveled with another undercover officer in an unmarked vehicle to the gas station at Gibson and University, where he located the white Ford pickup truck identified by the other officers in the adjacent hotel parking lot.

20.     Agent Teague followed Officer Lucero in another unmarked vehicle and parked in the area of the gas station, where he could observe the blue pickup truck, the white Ford pickup truck, and Officer Lucero's vehicle.

21.     During the entire time that Agent Teague was observing the gas station area, the occupants of the blue pickup truck did not exit that truck or engage in any normal business such as pumping gas, using a pay phone, or entering the store area of the gas station.

22.     After parking his vehicle, Officer Lucero got out and walked up to the white Ford pickup truck.

23.     As Officer Lucero approached, Defendant Marquez and the other occupant of the white Ford pickup truck, who was later identified as Defendant Lujan, exited their truck and introduced themselves to Officer Lucero by their first names:  "Joel."

24.     While standing beside the white Ford pickup truck, Officer Lucero asked to see the cocaine and told Defendants Marquez and Lujan that he had the money.  In response, Defendant Marquez asked to count the money, and Officer Lucero replied by indicating that he would get the money if they would show him the cocaine.

25.     Defendant Lujan then made a statement to the effect that the cocaine was "not here" but was "close by"; he suggested that the parties go to Officer Lucero's house to complete the sale.

26.     Defendant Marquez then instructed Defendant Lujan to show Officer Lucero "a little bit," whereupon Officer Lucero observed Defendant Lujan retrieve a "bindle"

(consisting of a folded dollar-bill) from the ashtray of the white Ford pickup truck and hand it to Defendant Marquez.

27.    The bindle was then unfolded in Officer Lucero's presence, revealing a small amount of a white powdery substance that Officer Lucero recognized from his training and experience as cocaine.

28.    After the contents of the bindle was displayed to Officer Lucero, Defendant Marquez handed it back to Defendant Lujan, who put it back in the ashtray of the white Ford pickup truck.

29.    After Defendant Lujan put away the bindle, a security guard from the adjacent hotel entered the scene and asked Officer Lucero and Defendants Marquez and Lujan to leave the area, whereupon Defendant Lujan indicated that he would follow Officer Lucero's vehicle as it exited the parking lot, and the conversation ended.

30.    During his entire conversation with Defendants Marquez and Lujan in the hotel parking lot adjacent to the gas station, Officer Lucero was wearing a "wire" (or concealed listening device) that enabled Agent Teague and other undercover officers at the scene to hear that conversation.

31.    While walking back to his vehicle after concluding his conversation with Defendants Marquez and Lujan at the hotel parking lot adjacent to the gas station, Officer Lucero reported to Agent Teague via his "wire" that the occupants of the white Ford pickup truck had shown him a bindle of cocaine and that they said that the rest of the cocaine was close by.

32.     As Officer Lucero walked back to his vehicle in the hotel parking lot, Defendants Marquez and Lujan reentered the white Ford pickup truck and drove to a location directly beside the blue pickup truck, which was still parked in the gas station parking area. At that location, the white Ford pickup truck paused while the blue pickup truck backed out of its parking space, and then the blue pickup truck began to closely follow the white Ford pickup truck as the white Ford pickup truck circled back to the location where Officer Lucero's vehicle was located.

33.     As the two pickup trucks began to follow Officer Lucero's vehicle in the hotel parking lot, Agent Teague ordered a marked APD vehicle to stop the white Ford pickup truck.  Shortly thereafter, a marked APD vehicle drove between the white Ford pickup truck and the blue pickup truck and turned on its emergency lights.

34.     When the marked APD vehicle pulled behind the white Ford pickup truck and engaged its emergency lights, the white Ford pickup truck continued driving for about thirty seconds to one minute and turned around the corner of the hotel before coming to a stop.

35.     Based on the totality of the circumstances, the stop of the white Ford pickup truck was supported by a reasonable suspicion that criminal activity was afoot.

36.     The officers in the marked APD unit performed a "felony stop" of the white Ford pickup truck, and Defendants Marquez and Lujan were placed under arrest immediately after the white Ford pickup truck in which they were traveling was stopped.  The felony stop involved detaining these Defendants at gunpoint, ordering them to lay on the ground, and placing them in handcuffs.

37.     Based on the totality of the circumstances, the arrest of Defendant Marquez was supported by probable cause.

38.     Prior to advising Defendants Marquez of his rights in accordance with <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), Agent Teague observed a mobile telephone in Defendant Marquez's pocket and asked him whether that phone was his.  Defendant Marquez replied in the affirmative.  Counsel for the Government conceded at the suppression hearing that Defendant Marquez's reply to this question was obtained in violation of Defendant Marquez's <u>Miranda</u> rights.  There is no factual nexus, however, between Defendant Marquez's reply and the subsequent discovery of any other evidence.

39.     Without reference to Defendant Marquez's statement, Agent Teague independently determined that the number of the mobile telephone found in Defendant Marquez's pocket was the same number from which the three calls were made to Officer Lucero earlier that day regarding the sale of the two kilograms of cocaine.  This determination was made by comparing the number indicated on the telephone itself with the number indicated on the "Caller I.D." feature of Officer Lucero's mobile telephone during the three calls.  Agent Teague also independently determined that the mobile telephone found in Defendant Marquez's pocket was registered to a business owned by a relative of Defendant Marquez.

40.     Defendant Lujan asserted his right to counsel immediately after being arrested, and he was not questioned by the officers involved in the undercover operation after making

that assertion.  Defendant Lujan has not moved to suppress any evidence or statements in this case.

41.     After placing Defendants Marquez and Lujan under arrest, Agent Teague and other officers searched their persons as well as the white Ford pickup truck.  The officers found a roll of duct tape behind the front seat of the white Ford pickup truck, but no cocaine was found during that search or during a subsequent search of the parking lot area.

42.     Based upon the totality of the circumstances, but without reference to any statements obtained in violation of any Defendant's Miranda rights, the search and seizure of the white Ford pickup truck and Defendant Marquez's person were supported by probable cause.

43.     While Agent Teague continued to detain and search Defendants Marquez, Defendant Lujan, and the white Ford pickup truck at the hotel parking lot, other officers, including Officer Lucero, followed the blue pickup truck, which continued traveling westbound on Gibson, turned northbound on Interstate 25, exited Interstate 25 at Montgomery, and continued eastbound on Montgomery.

44.     Officer Lucero observed that the blue pickup truck was traveling at an unusually slow rate of speed, which was not consistent with the level of traffic on the road at that time.

45.     Pursuant to instructions from Agent Teague, a marked APD unit executed a felony stop of the blue pickup truck as it traveled eastbound on Montgomery just past

Carlisle.  This felony stop involved detaining these Defendants at gunpoint, ordering them to lay on the ground, and placing them in handcuffs.

46.     Based on the totality of the circumstances, but without reference to any statements obtained in violation of any Defendant's <u>Miranda</u> rights, the stop of the blue pickup truck was supported by a reasonable suspicion that criminal activity was afoot.

47.     The occupants of the blue pickup truck were subsequently identified as Defendants Torres and Soto, and they were placed under arrest immediately following the stop of the blue pickup truck.

48.     Based on the totality of the circumstances, but without reference to any statements obtained in violation of any Defendant's <u>Miranda</u> rights, the arrests of Defendants Torres and Soto were supported by probable cause.

49.     Agent Teague testified, without objection, that another DEA agent reported to him that Defendant Torres made a statement to the effect that "they're in the speaker" after the agent stated to Defendant Torres:  "You know why we're here.  Where is it?"

50.     According to Agent Teague, both the other DEA agent's statement and Defendant Torres's response were made after Defendant Torres and Soto were placed under arrest but before these Defendants were advised of their <u>Miranda</u> rights.  Counsel for the Government conceded at the suppression hearing that Defendant Torres's statement to the effect that "they're in the speaker" was obtained in violation of Defendant Torres's <u>Miranda</u> rights.

51.     Agent Teague subsequently determined that Defendant Torres was the registered owner of the white Ford pickup truck in which Defendants Marquez and Lujan were traveling at the time of their arrest, and that Defendant Soto was the owner of the blue pickup truck in which Defendants Torres and Soto at the time of their arrest.

52.     Following their arrest, Defendants Marquez, Lujan, Torres, and Soto were transported to the Albuquerque office of the DEA, where they were placed in holding cells and booked.

53.     Agent Teague testified, without objection, that during the booking process another agent asked Defendant Marquez for his telephone number, and Defendant Marquez gave the following number:  505-649-3465.  This response was incriminating because the number given by Defendant Marquez matches the number from which Officer Lucero was called when he set up the meeting at the gas station.

54.     Agent Teague did not know whether the booking question regarding Defendant Marquez's telephone number occurred before or after Defendant Marquez was advised of his Miranda rights, nor did Agent Teague know the exact phrasing of the other agent's questions during the booking process (such as whether Defendant Marquez was asked for his home phone number, office phone number, or mobile phone number).

55.     At the time Defendant Marquez was booked, the agents involved in the undercover operation collectively knew that Defendant Marquez's statements regarding his mobile telephone number would be incriminating.

-12-

56.     The Government has not met its burden of showing that Defendant Marquez knowingly and voluntarily waived his <u>Miranda</u> rights at the time he was questioned during the booking process about his telephone number, and under the particular circumstances of this case, this communication does not fall under the exception to the <u>Miranda</u> requirements for routine booking questions.  There is no factual nexus, however, between Defendant Marquez's statement during the booking process and the subsequent discovery of any other evidence.

57.     After being placed in the holding cells at the DEA's Albuquerque office, Defendants Marquez, Torres, and Soto were each taken separately and individually to an interrogation room, where Agent Teague advised Defendants Marquez, Torres, and Soto, of their <u>Miranda</u> rights and proceeded to question them.

58.     Defendants Marquez, Torres, and Soto each made statements to Agent Teague after he advised each of them of their <u>Miranda</u> rights.  Such statements were voluntary and were not obtained in violation of these Defendants' <u>Miranda</u> rights.

59.     In addition, Defendant Soto signed a written form indicating that he consented to a search of the blue pickup truck.  Defendant Soto signed the form after Agent Teague advised him of his <u>Miranda</u> rights and specifically told him that he did not have to allow the search.

60.     After obtaining the consent of Defendant Soto, DEA agents searched the blue pickup truck.  On the front passenger seat of the blue pickup truck, they found a speaker cabinet.  The speaker cabinet was not wired or otherwise attached to the blue pickup truck.

-13-

61.     Inside the speaker cabinet were two bundles wrapped in duct tape.  The duct tape on the bundles was the of the same type as the roll of duct tape that was found in the cab of the white Ford pickup truck.  Upon unwrapping the duct tape from the bundles, the agents discovered approximately two kilograms of a white powdery substance that field-tested positive for cocaine.

62.     Based upon the totality of the circumstances, but without reference to any statements obtained in violation of any Defendant's <u>Miranda</u> rights,  the agents' search and seizure of the blue pickup truck and its contents (including the speaker cabinet found on the front seat) was supported by probable cause.

63.      Based upon the totality of the circumstances, Defendant Soto voluntarily consented to the search of the blue pickup truck and its contents.

## II.     <u>LEGAL ANALYSIS AND CONCLUSIONS OF LAW</u>

The central question raised in the motions to suppress filed by Defendants Torres, Soto, and Marquez is whether the DEA agents and APD officers involved in the undercover operation had probable cause to arrest these Defendants and to search their persons and the vehicles in which they were traveling at the time those vehicles were stopped.  The Court answers this question in the affirmative with respect to all three Defendants and with respect to both vehicles.

The motions to suppress filed by Defendants Torres, Marquez, and Soto raise additional questions concerning the suppression of particular statements made by these Defendants after they were placed under arrest.  Although the Court also finds that two

statements made by Defendant Marquez and one statement made by Defendant Torres were obtained in violation of their respective <u>Miranda</u> rights, the other evidence and statements obtained by law enforcement personnel in this case need not be suppressed because there is no factual nexus between that evidence and the illegally obtained statements, and the other evidence was discovered independently and inevitably without reliance on those statements.

### A.      <u>Defendants' Standing to Challenge the Searches and Seizures</u>

The Fourth Amendment to the United States Constitution protects Defendants' right to be secure in their persons and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." <u>United States v. Chadwick</u>, 433 U.S. 1, 12 (1977), <u>overruled in part on other grounds</u>, <u>California v. Acevedo</u>, 500 U.S. 565 (1991).  In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996).  Thus, Defendants Marquez, Torres, and Soto were seized within the meaning of the Fourth Amendment when they were stopped by the APD officers.  <u>See</u> <u>id.</u>

These Defendants have standing to challenge the seizure of their respective persons regardless of their possessory interest or property interest in the pickup trucks in which they were traveling, <u>see</u> <u>United States v. Shareef</u>, 100 F.3d 1491, 1500 (10th Cir. 1996), and it is the Government's burden to show that the seizure was reasonable, <u>see</u> <u>United States v.</u>

Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993).  If the Government cannot meet this burden, then the evidence obtained as a result of the seizure must be suppressed unless it was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful seizure.  Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

### B. The Search and Seizure of the White Pickup Truck and its Occupants

The officers who stopped the two pickup trucks at issue in this case had a reasonable, articulable suspicion that criminal activity was afoot at the time these vehicles were stopped. See United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994).  Nevertheless, the Government still has the burden of proving that any seizures it seeks to justify solely on the basis of reasonable suspicion were "'sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). "[T]he use of firearms, handcuffs, and other forceful techniques" does not always fall within the limited scope of such an investigative detention based on reasonable suspicion.  Melendez-Garcia, 28 F.3d at 1052; see generally United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc).

In this case, APD officers and DEA agents conducted felony stops of both vehicles. The procedure used in these felony stops entailed detaining the occupants at gunpoint, ordering them to lay on the ground, and almost immediately placing them in handcuffs.  The Government has not explained or offered evidence to show why the use of such a procedure

in this instance was warranted by objective concerns about officer safety, such as indications that the vehicles' occupants were armed or violent.  Accordingly, the Court concludes that these felony stops were not justified by reasonable suspicion alone and must instead be treated as full custodial arrests conducted without a warrant.  See Melendez-Garcia, 28 F.3d at 1053; United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001).

Generally, a full custodial arrest conducted without a warrant in a public place requires probable cause.  See United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001); United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998).  "An officer has probable cause to arrest if, under the totality of the circumstances, he 'learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested.'" Morris, 247 F.3d at 1088 (quoting Vazquez-Pulido, 155 F.3d at 1216).  This standard requires more than a mere suspicion, see id., but "'does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams v. Williams, 407 U.S. 143, 148-49 (1972)).  Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe "'an offense' had been committed.  Edwards, 242 F.3d at 935 (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)).

"'[O]fficers may conduct a warrantless search of a person when it is incident to a lawful arrest of that person.'"  United States v. McKissick, 204 F.3d 1282, 1296 (10th Cir.

-17-

2000) (quoting <u>United States v. Anchondo</u>, 156 F.3d 1043, 1045 (10th Cir. 1998)).  "Such a search is not limited to a frisk for weapons, but may have as its purpose a search for evidence of a crime." <u>Id.</u>  "'[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may [also], as a contemporaneous incident of that arrest, search the passenger compartment of that automobile' and 'examine the contents of any containers found within the passenger compartment.'"  <u>United States v. Olguin-Rivera</u>, 168 F.3d 1203, 1205 (10th Cir. 1999) (quoting <u>New York v. Belton</u>, 453 U.S. 454, 460 (1981)). Thus, if law enforcement personnel have probable cause to arrest a suspect, and the arrest takes the form of a felony stop of a vehicle, then a contemporaneous search of the suspect's person, the passenger compartment of the suspect's vehicle, and any containers found within the passenger compartment is also justified.

Considering the totality of the circumstances at the time the white Ford pickup truck was stopped in the hotel parking lot, the Court concludes that the arrest of Defendant Marquez and the contemporaneous search of his person (revealing the mobile telephone in his pocket) and the white Ford pickup truck's passenger compartment (revealing the roll of duct tape) was supported by probable cause to believe that Defendant Marquez possessed with intent to distribute two kilograms of cocaine or was involved in a conspiracy regarding the sale of such a quantity of cocaine.  At the time of his arrest, the APD officers and DEA agents involved in the undercover operation at the gas station were aware that three telephone calls had been made to Officer Lucero to arrange for the sale of two kilograms of cocaine, that the white Ford pickup truck in which Defendant Marquez was traveling

-18-

matched the description given to Officer Lucero during the calls, and that an occupant of the white Ford pickup truck was seen speaking into a mobile telephone at the time of Officer's Lucero's third telephone call.  Further, the manner in which the white Ford pickup truck entered and exited the gas station area accompanied by the blue pickup truck was consistent with the common method of conducting relatively large illegal drug transactions that Officer Lucero and Agent Teague had observed in their past experiences with undercover operations.

Defendants make much of the fact that the "bindle" or sample of cocaine that Defendants Marquez and Lujan allegedly showed to Officer Lucero in the hotel parking lot was never recovered after the search and seizure of the white Ford pickup truck and its occupants.  While it is correct that an arrest may become illegal "[i]f the police learn information that destroys their probable cause to arrest a defendant," Edwards, 242 F.3d at 934, the failure to recover the "bindle" or sample of cocaine allegedly observed by Officer Lucero did not destroy their probable cause to arrest the Defendants in this case.  The fact that the cocaine was not found in the white Ford pickup truck was consistent with its occupant's statements to Officer Lucero that the two kilograms of cocaine were "not here" but were "close by."  In addition, other undercover officers, including Agent Teague, observed that the occupants of the white Ford pickup truck appeared to be working in tandem with the occupants of the blue Ford pickup truck.  Thus, even if the APD officers and DEA agents no longer had probable cause to believe that Defendants Marquez or Lujan were in actual possession of the small "bindle" or sample of cocaine, they still had probable cause to believe that the Defendants were in constructive possession of two kilograms of cocaine

or were involved in a conspiracy to distribute that amount of the drug.  See id. at 934-35. Hence, the felony stop and contemporaneous search of the white pickup truck and its occupants was not unreasonable within the meaning of the Fourth Amendment.

      C.      **Defendant Marquez's Post-Arrest Statements**

            1.      **Defendant Marquez's Statement at the Scene of His Arrest**

While at the scene of the stop of the white Ford pickup truck in the hotel parking lot, the officers who arrested Defendant Marquez found a mobile telephone in his pocket.  Shortly after making this discovery, but before advising Defendant Marquez of his Miranda rights, Agent Teague elicited a statement from Defendant Marquez to the effect that the mobile telephone found in his pocket belonged to him.  At the suppression hearing on December 6, 2002, counsel for the Government conceded that this statement was obtained in violation of Defendant Marquez's Miranda rights.  The Court agrees.  Thus, the first post-arrest statement by Defendant Marquez to the effect that the mobile telephone found in his pocket belonged to him must be suppressed under the exclusionary rule.

            2.      **Defendant Marquez's Statement During the Booking Process**

After Defendant Marquez was arrested, he was taken to the DEA's Albuquerque office, booked, and taken to an interrogation room, where he was advised of his Miranda rights by Agent Teague.  During the booking process, Defendant Marquez made a statement identifying the number of his mobile telephone in response to a question from the booking officer.  The officer or agent who booked Defendant Marquez did not testify at the suppression hearing, and the two witnesses who were called at the hearing (Agent Teague

-20-

and Officer Lucero) were unable to credibly testify as to whether the booking of Defendant

Marquez was preceded by Miranda warnings, or as to the exact words that were used to elicit

Defendant Marquez's mobile telephone number from him.

The Government contends that Defendant Marquez's statement during the booking

process falls under an exception to the Miranda requirements for routine booking questions

that was recognized by a plurality of the Supreme Court in Pennsylvania v. Muniz, 496 U.S.

582, 601-02 (1990) (plurality opinion).  This contention is without merit.  "'As the Muniz

plurality itself recognized, 'the police may not ask questions, even during booking, that are

designed to elicit incriminating responses.'"  United States v. Parra, 2 F.3d 1058, 1068 (10th

Cir. 1993) (quoting Muniz, 496 U.S. at 602 n.14 (internal quotation marks omitted)).

In this case, Defendant Marquez's identification of his mobile telephone number was

incriminating information because it provided additional evidence linking him to Officer

Lucero's three telephone calls regarding the sale of the cocaine, and the incriminating nature

of that information was obvious to the officers and agents involved in the undercover

operation.  Thus, the Court concludes that the booking questions regarding Defendant

Marquez's telephone number were designed to elicit incriminating information such that they

constitute "interrogation subject to the strictures of Miranda."  Parra, 2 F.3d at 1068.  The

Government failed to present sufficient evidence at the suppression hearing to show that

Defendant Marquez had been advised of his Miranda rights at the time he was booked, or

that the question used to elicit this statement was posed for the sole purpose of completing

booking or pretrial services.  Accordingly, Defendant Marquez's statement identifying his

mobile telephone number during the booking process must be suppressed under the exclusionary rule.

### 3.       Defendant Marquez's Statement in the Interrogation Room

After Defendant Marquez was taken to the interrogation room and advised of his <u>Miranda</u> rights by Agent Teague, he waived those rights and gave a third statement. Defendant contends that his third post-arrest statement, as well as all other incriminating evidence discovered after his first post-arrest statement, also must be suppressed.  This contention is without merit.

Based upon the Supreme Court's recent conferral of constitutional status on an individual's right to a <u>Miranda</u> warning, <u>see</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000), the Tenth Circuit has reasoned that the "fruit of the poisonous tree" doctrine first articulated in <u>Wong Sun</u>, 371 U.S. at 487-88, applies to physical evidence obtained as a direct result of a <u>Miranda</u> violation, at least where the application of that doctrine would serve <u>Miranda</u>'s deterrent purpose.  <u>See</u> <u>United States v. Patane</u>, 304 F.3d 1013, 1019-29 (10th Cir. 2002).  Thus, with respect to subsequently obtained physical evidence, the Court applies the "fruit of the poisonous tree" doctrine to the <u>Miranda</u> violations in this case.

The Tenth Circuit has recognized a distinction, however, "between fruits consisting of a subsequent confession by the defendant after having been fully Mirandized and fruits consisting of subsequently obtained 'inanimate evidentiary objects.'" <u>Id.</u> at 1021 (quoting <u>Oregon v. Elstad</u>, 470 U.S. 298, 309 (1985)).  In contrast to such inanimate objects, statements obtained from defendants after they have been advised of their <u>Miranda</u> rights

need not be excluded if they are "the product of '*volition*,' willingly offered up by a defendant who already had been made aware of his <u>Miranda</u> rights." <u>Id.</u> (quoting <u>Elstad</u>, 470 U.S. at 309); <u>see</u> <u>United States v. McCurdy</u>, 40 F.3d 1111, 1116 (10th Cir. 1994).

As a result of this distinction, it may not be necessary to apply the traditional "fruit of the poisonous tree" doctrine to subsequent statements obtained from defendants after they have been advised of their <u>Miranda</u> rights insofar as the issue of whether those subsequent statements are volitional (or willingly offered) already is considered as part of the "totality of the circumstances" test that courts must apply in any case to determine whether a defendant's waiver of <u>Miranda</u> rights is knowing and voluntary.  <u>See generally</u> <u>Morris</u>, 247 F.3d at 1090.  In this context, the "totality of the circumstances" test requires courts to examine whether there is a break in time and circumstances between an illegally obtained statement and a subsequent statement that is obtained after a defendant has been advised of his <u>Miranda</u> rights.  <u>Compare</u> <u>McCurdy</u>, 40 F.3d at 1117 (finding that such a break existed), <u>with</u> <u>United States v. Carter</u>, 884 F.2d 368, 373 (8th Cir. 1989) (finding that such a break was lacking).  Accordingly, the Court concludes that this test is appropriately applied to Defendant Marquez's third post-arrest statement in this case.

Applying this test, the Court further concludes that Defendant Marquez was advised of his <u>Miranda</u> rights and voluntarily waived those rights before making his third post-arrest statement.  While the circumstances of Defendant Marquez's arrest and the two statements that were elicited before he was advised of his <u>Miranda</u> rights are relevant factors that must be considered in assessing whether his third post-arrest statement was voluntarily made, in

this case the break in time and circumstances between the prior illegalities and the third

statement was sufficient to render the third statement "volition[al]" and "willingly offered"

as those terms are used in <u>Patane</u>, 304 F.3d at 1021.  <u>See</u> <u>McCurdy</u>, 40 F.3d at 1116-18.

The Court also concludes that none of the physical evidence obtained after Defendant

Marquez's first post-arrest statement requires suppression under the "fruit of the poisonous

tree" doctrine.  In order to show that such evidence must be suppressed as the "fruit" of his

illegally obtained statement, Defendant Marquez must demonstrate "'a factual nexus between

the illegality and the challenged evidence.'"  <u>United States v. Nava-Ramirez</u>, 210 F.3d 1128,

1131 (10th Cir. 2000).  If such a factual nexus is shown, then it becomes the Government's

burden to show by a preponderance of the evidence that "the evidence would have been

inevitably discovered, was discovered through independent means, or was so attenuated from

the illegality as to dissipate the taint of the unlawful conduct."  <u>Id.</u>; <u>accord</u>  <u>United States v.

Griffin</u>, 48 F.3d 1147, 1150 (10th Cir. 1995).

At the suppression hearing in this case, Defendant Marquez did not adduce that any

of the physical evidence he seeks to suppress "would not have come to light but for the

government's unconstitutional conduct" in eliciting the statements from him regarding the

mobile telephone found in his pocket.  <u>Nava-Ramirez</u>, 210 F.3d at 1131.  Rather, the

evidence obtained after Defendant Marquez's first post-arrest statement "would have

inevitably been discovered through independent legal means."  <u>Griffin</u>, 48 F.3d at 1151.

The number of the mobile telephone and the inference that it belonged to Defendant

Marquez would have inevitably arose from the lawfully and independently obtained evidence

that (1) the telephone was found in his pocket, (2) the number identified by the telephone itself matched the "caller I.D." information previously obtained by Officer Lucero, (3) Defendant Marquez was previously seen speaking on the telephone while Officer Lucero made his third telephone call to arrange for the sale of the cocaine, and (4) Officer Lucero could identify Defendant Marquez as the caller based on the prior telephone calls and the meeting in the hotel parking lot.  When combined with the other evidence obtained prior to Defendant Marquez's first post-arrest statement, this lawfully and independently obtained evidence is sufficient to establish probable cause to search the two pickup trucks and to arrest the four occupants of the pickup trucks without reference to that statement.  For these reasons, Defendant's third post-arrest statement was not obtained in violation of the requirements of <u>Miranda</u>, and, with the exception of the two prior statements noted above, none of the other evidence against Defendant Marquez must be suppressed under the "fruit of the poisonous tree" doctrine.

### D.   <u>The Seizure of the Blue Pickup Truck and its Occupants</u>

Based upon the totality of the circumstances at the time the blue pickup truck was stopped near the intersection of Carlisle and Montgomery, but without reference to any statements that were obtained in violation of any Defendant's <u>Miranda</u> rights, the Court concludes that the arrests of Defendants Torres and Soto were supported by probable cause to believe that they possessed with intent to distribute two kilograms of cocaine or were involved in a conspiracy regarding the sale of such a quantity of cocaine.  The law enforcement officers involved in the undercover operation were not relying on the mere

proximity of the blue pickup truck to the white Ford pickup truck to justify these arrests.  See Vazquez-Pulido, 155 F.3d at 1216-17.  Rather, they testified that numerous vehicles were in proximity to the white Ford pickup truck while it was in the parking lot area, and that the blue pickup truck was readily distinguishable from the other vehicles in the area based on the following observations.

First, the occupants of the blue pickup truck circled the area and parked in a manner that is consistent with counter-surveillance.  Second, none of the occupants in the blue truck ever exited that vehicle while it was parked on the gas station property to conduct normal business such as pumping gas, using a pay phone, or entering the store area.  Third, the timing of the blue pickup truck's entry and exit from the gas station area coincided with that of the white Ford pickup truck, and the blue pickup truck began to follow the white Ford pickup truck after the occupants of the white Ford pickup truck had their meeting with Officer Lucero in the adjacent hotel parking lot.  Finally, based on the officers' training and experience, it was common for drug traffickers dealing in relatively large quantities (such as two kilograms of cocaine) to conduct their transactions using more than one vehicle.

Based on this combination of factors, the officers and agents involved in the undercover operation could reasonably infer that when Defendants Marquez or Lujan indicated that the two kilograms of cocaine were close by, they probably meant that the drugs were in the blue pickup truck as opposed to some other vehicle or location in the area of the gas station.  See id.  Accordingly, the officers had probable cause to seize the blue pickup truck and its occupants.

-26-

E.      **Defendant Torres's Post-Arrest Statements**

1.      **Defendant Torres's Statement at the Scene of His Arrest**

During the arrest of Defendants Torres and Soto at the site where the blue pickup truck was stopped, Defendant Torres reportedly made a statement to the effect that "they're in the speaker," after a DEA agent reportedly stated to Defendant Torres: "You know why we're here.  Where is it?"  Counsel for the Government conceded at the suppression hearing that this statement by Defendant Torres was obtained in violation of Defendant Torres's Miranda rights.  The Court agrees.  Accordingly, that statement must be suppressed under the exclusionary rule.

2.      **Defendant Torres's Statement in the Interrogation Room**

The Court reaches a different conclusion with respect to any statements that Defendant Torres made after he was taken to the interrogation room at the DEA's Albuquerque office and advised of his Miranda rights.  As noted above, the Court applies the "fruit of the poisonous" tree doctrine to the physical evidence obtained after the first post-arrest statement was illegally obtained from Defendant Torres, see Patane, 304 F.3d at 1029, and the Court applies the "totality of the circumstances" test to determine whether Defendant Torres knowingly and voluntarily waived his Miranda rights before making his second post-arrest statement, see id. at 1021; McCurdy, 40 F.3d at 1116-18.

Applying the "totality of the circumstances" test, the Court concludes that Defendant Torres was advised of his Miranda rights and voluntarily waived those rights before making his post-arrest statement in the interrogation room.  While the circumstances of his arrest and

-27-

the prior statement that was elicited before Defendant Torres was advised of his <u>Miranda</u> rights are relevant factors that must be considered in assessing whether his subsequent post-arrest statement was voluntarily made, in this case the break in time and circumstances between the prior illegality and the statement made in the interrogation room was sufficient to render the third statement "volition[al]" and "willingly offered" as those terms are used in <u>Patane</u>, 304 F.3d at 1021; <u>see</u> <u>McCurdy</u>, 40 F.3d at 1116-18.

Thus, Defendant Torres's post-arrest statement in the interrogation room was not obtained in violation of the requirements of <u>Miranda</u>.  Further, as explained below, the prior statement by Defendant Torres to the effect that "they're in the speaker" does not require the suppression of any subsequently obtained physical evidence under the "fruit of the poisonous tree" doctrine.

**F.   The Search of the Speaker Cabinet in the Blue Pickup Truck**

The next question is whether the search of the blue pickup truck, including the search of the speaker cabinet found on the front seat, was reasonable under the Fourth Amendment. In answering this question, the Court must account for the Government's concession that Defendant Torres's post-arrest statement to the effect that "they're in the speaker" must be suppressed under the exclusionary rule and, therefore, cannot be used to establish probable cause for this search.  The fruits of the search of the speaker cabinet are only admissible if they were obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawfully obtained statement.  <u>Wong Sun</u>, 371 U.S. at 487-88; <u>see</u> <u>Erwin</u>, 875 F.2d at 269 n.2.

Ordinarily, a search of the passenger compartment of a vehicle (including a container stowed on the front seat) that is contemporaneous with the arrest of the vehicle's occupants is justified as a search incident to arrest.  See Olguin-Rivera, 168 F.3d at 1205.  In this case, however, such a search incident to arrest would have been performed by the same officers who contemporaneously obtained the statement from Defendant Torres in violation of his Miranda rights.  That statement referred to the speaker cabinet in which the drugs were eventually found.  Thus, a contemporaneous search of the speaker cabinet incident to Defendant Torres's arrest is not sufficiently distinguishable to be purged of the primary taint of the unlawfully obtained statement.

Recognizing this possibility, the Government seeks to justify the search of the blue pickup truck and the speaker cabinet on independent and alternative grounds.  The first of these grounds is that the agents' search of the blue pickup truck, including the speaker cabinet found on the front seat, was supported by probable cause without reference to Defendant Torres's illegally obtained statements.  "In the context of vehicle searches, a warrantless search is permissible if there is probable cause to believe that the vehicle contains contraband."  Edwards, 242 F.3d at 939.  "In addition, if there is probable cause to search a vehicle, the police are allowed to search any package within the vehicle that is capable of concealing the object of the search."  Id.  (citing Wyoming v. Houghton, 526 U.S. 295, 307 (1999)).

In this case, the white pickup truck in which Defendants Marquez and Lujan had been traveling was lawfully seized prior to the seizure and search of the blue pickup truck.  When

law enforcement officers lawfully stop a vehicle, they "may ask to see a driver's license and registration and check that they are valid." Holt, 264 F.3d at 1221.  In this case, the officer's vehicle registration check revealed that Defendant Torres, who was traveling in the blue pickup truck, was the registered owner of the white pickup truck.  This registration information further supported the inference that the occupants of the blue pickup truck and the occupants of the white pickup truck were working together, and when combined with all the other lawfully obtained evidence noted above, it provided probable cause to search the blue pickup truck in order to look for the two kilograms of cocaine that were the subject of the undercover operation.

The speaker cabinet located on the front seat of the blue pickup truck was a closed container or package capable of concealing the two kilograms of cocaine that was the object of the agent's search.  The speaker cabinet was not wired or otherwise attached to the blue pickup truck, and Defendants have presented no valid, rational means of distinguishing a detached speaker cabinet in this location from other types of closed containers within a motor vehicle that are subject to a search based upon probable cause.  Cf. Olguin-Rivera, 168 F.3d at 1206 (finding "no valid, rational means of distinguishing a container from a covered cargo area so as to permit the search of one and not the other").  Thus, there is no basis for suppressing the evidence found within the speaker cabinet.

In the alternative, the Government also contends that Defendant Soto independently consented to the search of the blue pickup truck and its contents after he was advised of his Miranda rights by Agent Teague in the DEA's interrogation room.  To prove that a

-30-

defendant's consent was knowing and voluntary, it is the Government's burden to show that, under the totality of the circumstances, there was no duress or coercion, the consent was unequivocal and specific, and the consent was freely and intelligently given.  See United States v. Drayton, 536 U.S. 194, 122 S. Ct. 2105, 2113-14 (2002); United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567 (10th Cir. 1993).  The Government met this burden here.

Although Defendant Soto was in custody at the time he signed the consent form, this fact alone does not render his consent involuntary.  See Rodriguez-Garcia, 983 F.2d at 1567; McCurdy, 40 F.3d at 1118-19.  Rather, the Court must consider the totality of the circumstances, with the Government bearing the burden of proof.  See Drayton, 122 S. Ct. at 2113.  In this case, the Court notes that by the time the consent form was signed, Agent Teague already had advised Defendant Soto of his Miranda rights and had specifically instructed him that he was not required to allow the search.  There is no indication that Defendant Soto could not understand the agent's request or attempted to raise any objection to it.  Although Defendant Soto previously had been subjected to a felony stop, there is no indication of an express or implied show of force by the agents present in the interrogation room that would suggest Defendant Soto's consent at that time was obtained under coercion or duress.  Under the totality of the circumstances, the Court concludes that Defendant Soto's consent to the search of the blue pickup truck was knowing and voluntary, see Rodriguez-Garcia, 983 F.2d at 1567-68, and that such consent provided a means of obtaining evidence that was "sufficiently distinguishable to be purged of the primary taint" of any statements

that were unlawfully obtained from his co-defendants.  Wong Sun, 371 U.S. at 487-88; see

Erwin, 875 F.2d at 269 n.2.

The Court notes that the consent form signed by Defendant Soto only refers to the

blue pickup truck as the thing to be searched; it does not refer to any specific items within

the truck, such as the speaker cabinet located on the front seat.  (Ex. 5.)  The general rule,

however, is that "where a suspect does not limit the scope of a search, and does not object

when the search exceeds what he later claims was a more limited consent, an officer is

justified in searching the entire vehicle," United States v. Wacker, 72 F.3d 1453, 1470 (10th

Cir.1995), including "the container in which the drugs were found," United States v. West,

219 F.3d 1171, 1177 (10th Cir. 2000).  Considering the totality of the circumstances, the

Court finds no basis for concluding that the scope of Defendant Soto's consent to the search

of the blue pickup truck was limited so as to exclude the contents of the speaker cabinet.

Accordingly, the search was not unreasonable within the meaning of the Fourth Amendment.

### G.   **Defendant Soto's Post-Arrest Statement**

Defendant Soto also was taken to the interrogation room at the DEA's Albuquerque

office and questioned by Agent Teague.  The statements obtained from Defendant Soto in

response to this questioning were preceded by Miranda warnings, and thus Miranda does not

provide a basis for suppressing these statements.  See United States v. Gell-Iren, 146 F.3d

827, 830-31 (10th Cir. 1998).  Further, after considering the factors enumerated in Morris,

247 F.3d at1090, the Court concludes that Defendant Soto's post-arrest statements in the

interrogation room were made after he knowingly and voluntarily waived his Miranda rights.

-32-

The Court specifically notes that there exists no factual nexus between Defendant Soto's statements and the statements that were illegally obtained from Defendant Torres and Defendant Marquez.  Without reference to the illegally obtained statements, the DEA agents and APD officers had independently obtained evidence which justified the search and seizure of the four Defendants and the two pickup trucks.  Thus, there are no valid grounds for suppressing the statements that Defendant Soto made in the interrogation room.

III.    **CONCLUSION**

For the foregoing reasons, the only evidence or statements that must be suppressed under the exclusionary rule in this case are:  (1) Defendant Torres's statement at the scene of the stop to the effect that "they're in the speaker"; (2) Defendant Marquez's statement at the scene of the stop to the effect that the mobile telephone found in his pocket belonged to him; and (3) Defendant Marquez's statement identifying his mobile telephone number during the booking process.  The searches and seizures of Defendants Marquez, Torres, and Soto, and the vehicles in which they were traveling, do not provide a basis for suppressing other statements or evidence in this case because they were not unreasonable under the Fourth Amendment, and because they were not the fruits of any illegally obtained statements.  Further, the other post-arrest statements obtained from Defendants Marquez, Torres, and Soto did not violate their rights under the Fourth, Fifth, or Sixth Amendments.

**IT IS, THEREFORE, ORDERED** that Defendant Joel Marquez's *Motion to Suppress Statements* [Doc. No. 42] is **GRANTED IN PART** with respect to (1) his

statement to the effect that the mobile telephone found in his pocket at the time of his arrest belonged to him, and (2) his statement at the time of his booking in which he identified the number of his mobile telephone.

**IT IS FURTHER ORDERED** that Defendant Joel Marquez's *Motion to Suppress Statements* [Doc. No. 42] is **DENIED IN PART** in all other respects.

**IT IS FURTHER ORDERED** that Defendant Hector Torres's *Motion to Suppress Evidence and Statements* [Doc. No. 34] is **GRANTED IN PART** with respect to his post-arrest statement to the effect that "they're in the speaker."

**IT IS FURTHER ORDERED** that Defendant Hector Torres's *Motion to Suppress Evidence and Statements* [Doc. No. 34] is **DENIED IN PART** in all other respects.

**IT IS FURTHER ORDERED** that Defendant Saul Soto's *Motion to Suppress Evidence and Statements* [Doc. No. 41] is **DENIED**.

**SO ORDERED** this 31st day of December, 2002, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge